ESTATE OF BARBARA WARNER McCAMPBELL, DECEASED, AMERITRUST TEXAS N.A., SUCCESSOR IN INTEREST TO MTRUST CORP., N.A., SUCCESSOR IN INTEREST TO MBANK CORPUS CHRISTI, N.A., SUCCESSOR IN INTEREST TO CORPUS CHRISTI NATIONAL BANK, INDEPENDENT EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of McCampbell v. Commissioner
Docket No. 34385-87
United States Tax Court
T.C. Memo 1991-141; 1991 Tax Ct. Memo LEXIS 160; 61 T.C.M. (CCH) 2263; T.C.M. (RIA) 91141; March 27, 1991, Filed *160 Decision will be entered under Rule 155. Decedent's husband (H) predeceased her by about 1 year. H's estate consisted mainly of two ranch properties valued on his return at $ 1,680,087. H's will contained a marital deduction bequest which passed to decedent that amount of property qualifying for the marital deduction which, in conjunction with the 1983 unified credit ($ 275,000 exemption amount), resulted in no estate tax. The remainder of H's estate passed to decedent and the couple's two children pursuant to a residuary/bypass trust. The will did not specify which assets were to fund the marital bequest. However, certain will provisions and a codicil executed by H directed that the ranchlands pass into the residuary trust for the benefit of H's bodily heirs. In his statutory notice, R valued the ranches at $ 4,560,904. He also determined that 100 percent of both properties passed outright to decedent pursuant to the martial deduction bequest in H's will. The estate offered two employees of the bank who served as executor under the wills of H and decedent to testify as to the value of the real property. R objected on the grounds that the officers were not experts and *161 not qualified to testify under Fed. R. Evid. 701 and 702. Held, Employees of executor-bank did not qualify, under Fed. R. Evid. 702, as experts for purposes of presenting opinion testimony on certain valuation issues. Additionally, neither of P's trust officers had sufficient personal knowledge of the properties to admit testimony on the valuation issues pursuant to Fed. R. Evid. 701. Held further, value of two separate ranch properties determined. Held further, H's will interpreted to contain testamentary intentions that ranches may be fractionalized to fund both marital and residuary bequests. Held further, the estate is not entitled to a minority discount for the fractional interest held by decedent in the ranch properties. Lance K. Bruun, Richard L. Lechin, and Paul O. Price, for the petitioner. Jan W. Busby, for the respondent. GERBER, Judge. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $ 1,633,966 in decedent wife's estate. The deficiency arose in connection with the valuation of certain ranchland passing to decedent under the terms of her deceased *162 husband's will. We consider [1] here the correctness of petitioner's interpretation as to which property should be used to satisfy the marital bequest to decedent in connection with her deceased husband's will and the value of said property. FINDINGS OF FACT The parties entered into a stipulation of facts, along with attached exhibits, all of which are incorporated by *163 this reference. Barbara Warner McCampbell (Decedent) died on March 5, 1984. Corpus Christi National Bank was appointed as the duly qualified independent executor on March 20, 1984. The bank's principal place of business was located at 500 North Shoreline, Corpus Christi, Texas. On October 15, 1984, the bank's title was changed to MBank Corpus Christi, N.A. MTrust Corp., N.A., assumed the fiduciary duties of MBank in September 1988. In February 1990, MTrust Corp, N.A. was purchased by Ameritrust Corporation, and its name was changed to Ameritrust Texas N.A. Ameritrust Texas N.A. is the current acting and appointed independent executor for the Estate of Barbara Warner McCampbell. On December 5, 1984, a United States Estate Tax Return (Form 706) for the Estate of Barbara Warner McCampbell was filed by the independent executor with the District Director, Internal Revenue Service, Austin, Texas. The alternate valuation date of September 5, 1984, was elected on the return. A gross estate of $ 2,701,085 comprised of real estate and miscellaneous assets was reported on the return. Included as part of the estate's assets were two noncontiguous parcels of ranchland. The first tract, *164 reported as item 1 on Schedule A of the return, was a 4,363.6-acre parcel referred to as the Las Vivoritas tract (Las Vivoritas). The second parcel, also reported on Schedule A, was a 2,685.9-acre [2] property referred to as the Las Animas tract (Las Animas). Las Animas and Las Vivoritas were originally owned as the separate property of decedent's husband, Dick Jones McCampbell (husband or Mr. McCampbell). Although Texas is a community property State, these ranches were not part of the McCampbell's marital estate. Husband acquired the ranches by a Deed of Partition dated October 7, 1968, wherein he was granted a fee simple interest in all 2,685.9 acres of the Las Animas tract. The same deed also granted husband an interest in 4,363.6 acres of the Las Vivoritas tract. However, 3,273.59 of these acres were subject to a life estate in favor of Mr. McCampbell's mother, Mae McCampbell *165 (husband's mother or mother-in-law), leaving him a remainder interest therein. The remaining 1,090.01 Las Vivoritas acres were held by husband in fee simple. In December 1968, husband's mother leased 307.88 acres out of the 3,273.59 acres subject to her life estate to husband. The term of the lease was "for and during the natural life of Mae McCampbell" and required annual rental payments. Husband died on January 9, 1983, and was survived by his spouse, Barbara Warner McCampbell, his daughter, Mary Barbara McCarty, and his son, Dick Jones McCampbell, Jr. He was also survived by his mother, Mae McCampbell. Mr. McCampbell's testamentary documents consisted of a will and first codicil executed on July 19 and August 12, 1982, respectively. These testamentary documents were admitted to probate on January 13, 1983. Generally, all assets owned by husband at his death were accounted for and passed under one of two clauses in his will: the Marital Deduction Bequest, or the Residuary Estate. In pertinent part, the Marital Deduction Bequest provides as follows: A-1  Marital Deduction If my spouse, Barbara W. McCampbell, shall survive me, I give to her an amount of property (such *166 amount being hereafter called "my spouse's amount") that shall by [sic] equal in amount to (i) the maximum marital deduction allowable to my estate under Section 2056 of the United States Internal Revenue Code of 1956[sic] (as amended from time to time prior to my death), less (ii) the value of all property and interests in property which pass or have passed to my spouse, under other provisions of this will or otherwise, are finally included in my gross estate, and which qualify for the marital deduction; provided, however that my spouse's amount shall be reduced by the amount, if any, required to increase my taxable estate to the largest amount possible that will still result in no United States Estate Tax being imposed on by [sic] estate after allowing for the unified credit against said estate tax and the state death tax credit available to my estate under the provisions of said code. * * * * * * (b)  I direct that my Executrix shall satisfy my spouse's amount in cash or in kind, or partly in each, with assets eligible for the marital deduction; assets allocated in kind shall be deemed to satisfy this amount on the basis of their values as finally determined for federal estate *167 tax purposes. I further direct that my Executrix satisfy this pecuniary bequest by distributing assets fairly representative of appreciation or depreciation in value of all property available for distribution. If my spouse fails to survive me, this Paragraph A-1 shall be inapplicable, and the properties which would have passed by this Paragraph A-1 shall be added to my Residuary Estate.
The will also granted the executrix the fiduciary power to sell estate assets and such power could have been used to properly fund the marital bequest. Mr. McCampbell's residuary estate was provided for in article B of his will. Article B states that the residuary estate is comprised of the remainder of his property (real, personal, or mixed) including all lapsed bequests and devises which fail for any reason. More specifically, paragraph B-2 provides that if his spouse survived him, husband's residuary estate was devised and bequeathed to his trustee in trust for the benefit of his spouse, children, and grandchildren. The trustee was given the power to accumulate all or any part of the income or to distribute any part of the income or principal to Mr. McCampbell's spouse, his children, *168 or grandchildren for their health, support, maintenance, and education. The residuary estate was also burdened with all taxes, debts, and administration expenses. Paragraph B-2 also provides for the final disposition of the residuary estate. At the death of Mr. McCampbell's spouse or in the event she did not survive him, one-half of the principal and income from the residuary trust would remain in trust for the benefit of Mary Barbara McCarty with remainder to her children. The other one-half of the principal and income of the trust would remain in trust for the benefit of Dick Jones McCampbell, Jr., with the remainder in trust for his children. Paragraph B-2 also contains husband's desire that his estate pass only to his children and their blood issue. Other specific beneficiaries were also named in the case husband died with no grandchildren. Paragraph B-3 directed that a trust be established for any assets which were the subject of a qualified disclaimer by the surviving spouse or other beneficiary. Any principal or income accumulated in that trust and remaining at the spouse's death was to pass into and pursuant to the terms of the paragraph B-2 residuary trust. Paragraph *169 B-5 of Mr. McCampbell's will bears the heading "Special Instructions" and contains the following: I desire to designate the use of the ranchlands portions of my estate all of which shall pass in trust as above specified. Such ranchlands shall remain intact and in the event that my wife has failed to exercise fully and effectively the special power of appointment granted to her in commection [sic] therewith I would provide that such ranchlands [and] the improvements located thereon shall be controlled as follows: (1)  That Mary Barbara McCampbell McCarty shall be entitled to use the Las Animas Ranch * * * for her life and at her death such ranchland to pass unto her issue. Provided however that no beneficiary shall be entitled to such ranchland except blood issue children of the said Mary Barbara McCampbell McCarty and other beneficiaries as are heretobefore specified in B-2. * * * I would further provide that Dick Jones McCampbell, Jr. during his life should have the use of Las Vibros [sic] Ranch which has about 4,300 acres * * * and I would specifically want this ranch property to pass into any Trust for his benefit and the benefit of his blood issue children.
The special *170 instructions paragraph also specified that in the event Mr. McCampbell's children or grandchildren desired to sell the tract inherited by them, they would be required to offer it first to the other sibling or his or her blood issue, it being his intention that "such children and/or grandchildren of mine shall always have the first right of refusal on the purchase of such properties." Although it is unclear from the face of the document which trust is referred to in the paragraph B-5 special instructions, references to paragraph B-2 in the disclaimer provisions and in the B-5 provision indicate that all assets, including the ranchlands, were intended by Mr. McCampbell to ultimately pass into the paragraph B-2 residuary trust. Approximately 1 month after executing his will, husband amended paragraph B-5 by codicil. Since the Las Vivoritas tract was larger than the Las Animas tract, the intent of the codicil was to equalize the amount of the paragraph B-5 trust distributions. The codicil supplemented the original B-5 amounts and gave Mary Barbara McCampbell McCarty "that portion of my other properties which shall remain at the death of my surviving wife, should there be any, so as *171 to equalize this distribution of lands."  The codicil also stated that "If there are not sufficient properties to provide for such distribution under these circumstances I do further bequest that my Trustee impress a lien on lands set aside to Dick Jones McCampbell, Jr., so as to completely equalize this distribution." Husband's will does not contain a provision disposing of an amount of property equal to the unified credit equivalency amount excepted from the marital bequest. The unified credit amount in 1983 was $ 79,300 or an exemption equivalent amount of $ 275,000. Additionally, husband's will does not grant Barbara McCampbell a special power of appointment over the ranchlands. However, it does name her as both executrix of his estate and trustee of the residuary trust. Corpus Christi National Bank was appointed as successor trustee and executor in the event of her death. In accordance with paragraph A-1 of the will, the return prepared for the Estate of Dick Jones McCampbell reflected that sufficient property passed to Mrs. McCampbell so that no estate tax was due after allowing for the unified credit. After offsets for administrative expenses, bequests to the surviving *172 spouse, and the unified credit, the estate tax return showed a balance due of zero. Pursuant to Schedule M of the return, bequests to the surviving spouse were determined to be $ 1,831,667. This number was derived as follows: Total
Estate Assets
$ 2,151,568 Less:
Total Estate Deductions (44,901)
Less:
Assets Transferred to
Trust in Amount Equal to
Unified Credit as of 1-9-83
(275,000)
1,831,667 Thus, the estate was entitled to a marital deduction in the amount of $ 1,831,667. On Mr. McCampbell's return, the Las Animas and the Las Vivoritas tracts were valued at $ 1,680,087. In July 1983, while acting in her individual capacity and as the trustee under the her husband's will, Barbara McCampbell executed a 5-year grazing lease. The lease was effective July 1, 1983, and pertained to all acreage in the Las Animas tract. It also covered 1,397.89 acres of the Las Vivoritas parcel, which included the 1,090.01 acres inherited by Mrs. McCampbell in fee simple from her husband, plus the 307.88 acres under lease from husband's mother's (Mae McCampbell) life estate. As drafted, the lease would automatically be extended to cover the acreage burdened by the life estate *173 in the event Mae McCampbell died during the term of the lease. Barbara Warner McCampbell died on March 5, 1984. She was survived by her daughter Mary Barbara McCarty, her son Dick Jones McCampbell, Jr., and her mother-in-law, Mae McCampbell. At the time of Mrs. McCampbell's death, husband's mother was 91 years old and was actively involved in the ownership and operation of the life estate property. Husband's mother was still living as of the time of trial. All property owned by Barbara Warner McCampbell at the time of her death passed pursuant to a will and first codicil whose terms were identical and were reciprocal to the will and first codicil of husband. On March 20, 1984, Corpus Christi National Bank became the independent executor of the Estate of Barbara Warner McCampbell. Because of her death, the bank also became the executor to Mr. McCampbell's estate and the trustee of the residuary trusts created under both wills. Administration of Mr. McCampbell's estate was in a confused state at the time the bank assumed its fiduciary responsibilities and assets had not been selected for purposes of funding the residuary trust. In its capacity as independent executor of *174 the Estate of Barbara McCampbell, the bank executed a short-term hunting lease extending to both the 1,090.01 acres of the Las Vivoritas tract held by Mrs. McCampbell's estate in fee simple and the 307.88 life estate acres in the same tract leased to the estate by husband's mother. The lease was for the 6-month period September 1, 1984, to February 28, 1985. Consideration for the lease was $ 9,000. An oral hunting lease was also executed for the Las Animas tract in consideration for the sum of $ 12,000. The lease covered the 6-month period September 1985 to February 1986. As contained in the Estate Tax Return filed in December 1984, Barbara McCampbell's $ 2,701,085 gross estate included real estate in the amount of $ 1,975,611. This amount included the two parcels of ranchland. In preparing the return, the independent executor valued the two tracts as follows: 4,363.6 acres: Las Vivoritas:
1,090.01 acres at $ 300 per acre
$ 327,003 3,273.59 acres at $ 300 per acre
982,077 Less: Life estate to mother
age 91 .26955 x $ 982,077
(264,719)
Total Las Vivoritas
$ 1,044,361
2,685.5 acres: Las Animas at $ 300 per acre
805,650
Total value of ranchlands
$ 1,850,011
*175 Although Mrs. McCampbell's estate initially included both ranches, based on its interpretation of husband's will, the executor subsequently determined that 86 percent of the ranchlands should be used to fund the marital bequest while 14 percent of the properties should be used to fund the residuary trust. The Las Animas and the Las Vivoritas tracts are located in the ranch country of south Texas and were used by the McCampbells for beef cattle ranching and recreational hunting. The McCampbells utilized both tracts as one cattle ranching unit, despite the fact that the two tracts were 28 miles apart. Access to Las Vivoritas was provided by a private road. However, access to Las Animas was possible only through another ranch. Access to this property was initially assumed by the parties to be protected by a recorded easement over the neighboring property. However, according to Day Manley, the bank officer responsible for administering the estate, the neighboring landowner informed the bank 1 week prior to trial that a deeded easement did not exist for the Las Animas tract. The bank undertook a search for the deed and discovered that neither the bank's records nor the local conveyance *176 records contained a deeded easement for the Las Animas tract. Although the bank was not aware of this fact until 1989, a willing purchaser having knowledge of all relevant facts would have discovered, as of the September 1984 alternative valuation date, that the parcel lacked a deeded access. Ms. Manley had been a bank officer for 16 years and had been employed by the bank as a trust officer since January 1986. While she was responsible for supervising the McCampbell accounts and was generally able to describe the ranch properties, she had no regular dealings with the tracts. Ms. Manley did not know how access to the Las Animas tract was obtained during the last 20 years. Mr. Jerry Dittmar, another trust officer of the bank, joined the bank in 1984 as a trust officer responsible for account administration. In 1985, his sole duty was as an estate property manager. Prior to commencing his duties with MBank, Mr. Dittmar received a degree in animal science and a master of agriculture in agricultural banking from Texas A & M University. He had also been involved with his family's cattle ranch in Texas. He was generally familiar with Texas ranching and recreational hunting. As *177 the bank's property manager for the McCampbell ranches, Mr. Dittmar inspected these properties eight times. He was also generally familiar with land classifications and the topography of the McCampbell ranches. However, Mr. Dittmar did not independently analyze the soil classifications on the ranches. Although he was the property manager, Mr. Dittmar made no effort to repair the fencing on the Las Animas sand dunes to stabilize them and prevent grazing upon them. On July 23, 1987, respondent issued a notice of deficiency wherein he determined that the total value of the two tracts was $ 4,560,904. This amount reflected a per-acre value for Las Animas of $ 725, a per-acre value for Las Vivoritas of $ 750, and a 26.955-percent discount for the Las Vivoritas acreage subject to the life estate. A $ 9,500 increase to the gross estate was also made for certain stock omitted from petitioner's initial calculation of the estate. A deduction for Federal income taxes was also allowed and certain estate tax payment elections were denied. These adjustments resulted in a deficiency of $ 1,633,966. OPINION This case presents several issues. We consider here which property interests *178 passed to Barbara McCampbell's estate in order to satisfy the terms of her husband's will. More specifically, we must decide whether Mr. McCampbell's will requires that Barbara McCampbell receive certain ranches outright as a marital bequest or whether the provisions reflect the intent that she receive a fractional interest therein. We also decide the fair market value of the ranches (Las Vivoritas and Las Animas). In the event we determine that Barbara McCampbell received a fractional interest in these properties, we must then decide whether a minority interest discount applies to the value of the ranchlands includable in her gross estate. Preliminary to addressing the above issues, we must first consider some evidentiary matters. They involve Federal Rules of Evidence (Fed. R. Evid.) 701 and 702 and whether employees of the bank (which is the executor of this estate) are experts who may testify as to value and/or whether they may give opinion testimony as lay witnesses. Additionally, we consider whether petitioner is entitled to offer evidence discovered about 1 week before trial regarding the lack of a recorded easement on the Las Animas ranch. I. Evidentiary Matters
*179 A. Opinion Evidence Concerning Value
Petitioner offered two of its employees to render opinion testimony regarding the effect that a lack of access has on value, the amount of discount applicable to a fractional interest, and the impact of a long-term grazing lease on value. Respondent argues that petitioner's employees are not experts qualified to give opinion testimony and that petitioner and its employees are not "owners" so as to enable them to give opinion testimony as a lay witness. The rules of evidence applied by this Court are statutorily prescribed to be the rules applicable to trials without jury in the United States District Court for the District of Columbia. Section 7453; [3] Rule 143(a). These include the Federal Rules of Evidence. Snyder v. Commissioner, 93 T.C. 529 (1989). *180 1. Federal Rule of Evidence 701
Under Fed. R. Evid. 701, opinion testimony by a lay witness is admissible if the testimony is based on the perception of the witness and it is helpful to a clear understanding of either the witness' testimony or the determination of a fact in issue. [4] Pursuant to this rule, a lay witness is permitted to offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived. This expression of opinion or inference is permitted because of the qualification in the rule that the witness have personal knowledge of the matter in order to testify to it. Teen-Ed, Inc. v. Kimball International, Inc., 620 F.2d 399, 403 (3d Cir. 1980); Lubecki v. Omega Logging, Inc., 674 F. Supp. 501, 510 (W.D. Pa. 1987), affd. without opinion 865 F.2d 251 (3d Cir. 1988). It is within the discretion of the trial judge to decide whether a lay witness is qualified to give opinion evidence. Trotter v. Todd, 719 F.2d 346, 349 (10th Cir. 1983). *181 The owner of property is qualified, by his ownership alone, to testify as to its value. Dehmer Distributors, Inc., v. Temple, 826 F.2d 1463, 1466 (5th Cir. 1987); United States v. Laughlin, 804 F.2d 1336, 1340 (5th Cir. 1986); Dietz v. Consolidated Oil & Gas, Inc., 643 F.2d 1088, 1094 (5th Cir. 1981); Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690, 698 (5th Cir. 1975), modified on other grounds en banc 575 F.2d 564 (5th Cir. 1978). Opinion testimony of a landowner as to the value of his land is admissible without further qualification because of the presumption of special knowledge that arises out of ownership of the land. LaCombe v. A-T-O, Inc., 679 F.2d 431, 434 (5th Cir. 1982); Meredith v. Hardy, 554 F.2d 764, 765 (5th Cir. 1977). Under common law and the Federal Rules of Evidence, the special knowledge accorded a property owner rests on a presumed familiarity with the property, knowledge or acquaintance with its uses and purposes, and experience in dealing with it. Robinson v. Watts Detective Agency, 685 F.2d 729, 738 (1st Cir. 1982); *182 United States v. 1,516.90 Acres of Land, 405 F.2d 913, 915 (6th Cir. 1968); Salvage & Surplus, Inc. v. Weintraub, 131 So. 2d 515, 516 (Fla. Dist. Ct. App. 1961); Burford Oil Co. v. Wadley, 41 S.W.2d 689, 694 (Tex. Civ. App. 1931). Such familiarity may also be obtained from the purchase of the property and from personal knowledge of the item. Meyerson v. Hartford Fire Ins. Co., 16 Misc. 286, 38 N.Y.S. 112, 113, (1896), affd. 17 Misc. 121, 39 N.Y.S. 329 (1896) (administratrix qualified to testify as to value of decedent's personal property since she purchased many of the items and others she knew from long acquaintance with them). Generally, there is no presumption that a representative of an owner, by virtue of that position, acquires special knowledge of the value of the owner's property. Salvage & Surplus, Inc. v. Weintraub, supra.[5] Instead, the representative must be shown to have independent knowledge regarding the property and its value sufficient to qualify him to give an expert opinion as to its value. Salvage & Surplus, Inc. v. Weintraub, supra. *183 Petitioner maintains that the value-related testimony of Day Manley and Jerry Dittmar, the MBank trust officers responsible for administering the trust accounts and managing the ranch properties, is admissible because the bank, as independent executor, may properly be regarded as the "functional owner" of said ranches. Under petitioner's theory, ownership status may be imputed between the bank and its employees. Petitioner's functional ownership concept is also premised on the fact that the terms of the McCampbells' wills gave the bank all power "To do all the acts, to take all the proceedings, and to exercise all the rights, powers and privileges which an absolute owner of the property would have, subject always to the discharge of its fiduciary *184 obligations." Petitioner contends that the bank's ownership status arose when it assumed its fiduciary role on March 20, 1984. Both petitioner and respondent presented arguments as to why the bank-executor is or is not considered the legal owner of the property under Texas law. However, we find it unnecessary to consider whether the bank and/or its employees could be considered the owner under State law. We find that neither Ms. Manley nor Mr. Dittmar was possessed of the quantity or quality of knowledge or experience with respect to the real property in question so as to be of any assistance to the Court. Even if the bank qualified as owner under Texas law and the ownership attributes could be imputed or attributed to these employees/representatives of the bank, they have not been shown to possess sufficient knowledge to place any weight upon their testimony. Ms. Manley did not assume her responsibilities for administering the trust until January 1986. While she was generally familiar with the ranches, this knowledge came from administrative dealings with the properties and not from day-to-day acquaintance, operation, or ranching experience with them. Such lack of familiarity *185 is demonstrated by the fact that she was unaware of how the McCampbells gained access to the tract in the past. Accordingly, we will not allow her lay witness opinion testimony on this issue to be admitted under Fed. R. Evid. 701. Other than her testimony regarding the 1989 discovery of the lack of an easement, which was within her personal knowledge, we do not rely on her testimony. Mr. Dittmar was originally a trust officer but later became a property manager of the ranches in 1985, a year after MBank assumed its fiduciary responsibilities for the ranches. Although Mr. Dittmar inspected the property approximately eight times in his capacity as property manager, he did not regularly participate in managing and operating the ranches. Moreover, his interest as a caretaker of the properties did not rise to the same level of knowledge that an owner would acquire. This aspect is highlighted, in part, by the fact that Mr. Dittmar did not repair the fencing on the Las Animas dune area to prevent grazing as would have been done by someone akin to an owner. Based on the record, Mr. Dittmar's knowledge and expertise concerning the property in question does not compare to that of an *186 owner. Accordingly, his opinion testimony will not be admitted as that of an owner/lay witness under Fed. R. Evid. 701. 2. Federal Rule of Evidence 702
Expert opinion testimony is admissible under Fed. R. Evid. 702. [6] The rule encompasses "not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values." See Advisory Committee Notes following Fed. R. Evid. 702; Robinson v. Watts Detective Agency, supra.
Under Fed. R. Evid. 702 there are two requirements for expert testimony, to wit: (1) The testimony must assist *187 the trier of fact (in this case the Judge) to understand the evidence; and (2) the witness must be qualified as an expert. It is within the discretion of the trial court to determine whether each of these requirements is met. Hamling v. United States, 418 U.S. 87, 41 L. Ed. 2d 590, 94 S. Ct. 2887 (1974). It is clear that expert testimony concerning value will assist the trier of fact in this case. We have already decided that Ms. Manley and Mr. Dittmar may not give opinions as lay witnesses concerning the value of the property under Fed. R. Evid. 701 and accordingly, we must decide whether they would otherwise qualify as experts for purposes of Fed. R. Evid. 702. The Court of Appeals for the Fifth Circuit [7] has held that an owner of property is an "expert" for purposes of Fed. R. Evid. 702. LaCombe v. A-T-O, Inc., 679 F.2d 431, 434-436 (5th Cir. 1982); Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690, 698-699 (5th Cir. 1975). Although an owner is considered an "expert" his testimony may be of such "minimal probative force to warrant a judge's refusal [to submit the issue to the trier of fact]." Kestenbaum v. Falstaff Brewing Corp., supra at 699. *188 Ms. Manley did not have sufficient knowledge or expertise to enable her to assist the trier of fact regarding the effect on value caused by the absence of a recorded easement on the subject property. No evidence was offered showing her experience, if any, concerning realty with access impediments due to the lack of a recorded easement. In short, Ms. Manley was not qualified as an expert in realty and, more to the point, concerning lack of access and its effect on value. Assuming arguendo that ownership was attributed to her for purposes of Fed. R. Evid. 702, the probative value of Ms. Manley's knowledge and expertise is too minimal to be of assistance to the trier of fact. Petitioner argues that Mr. Dittmar's testimony regarding the amount of minority interest discount applicable to the McCampbell ranches is admissible as an expert opinion. Mr. Dittmar had a background in agriculture and some personal experience in ranching. He was *189 generally familiar with south Texas ranching and the soil topography in the area. He had a general idea of the cattle capacity and soil composition of the subject properties, although he had not made an independent investigation of the soil content. However, we find that his general Texas ranching experience, his agricultural-educational background, and his limited experience as a property manager are not sufficient to qualify him as an expert witness for the specialized or limited purpose of testifying as to the applicability and amount of a minority interest discount. Unlike Ms. Manley, Mr. Dittmar is not being offered as an expert on the value of the realty, but upon the theoretical concept of a minority interest discount. That is not a subject that ownership would normally or logically qualify one as an expert on, unless it was shown that the owner was one of fractional or minority interests. That has not been shown with respect to Mr. Dittmar. If we were to assume arguendo that ownership was attributed to Mr. Dittmar for purposes of Fed. R. Evid. 702, the probative value of his knowledge and expertise regarding minority discounts is too minimal to be of assistance to the *190 trier of fact. Even though we have found that Ms. Manley and Mr. Dittmar are not qualified as experts, or if they were experts, that the probative value of their opinions is minimal, we must note that petitioner failed to comply with Rule 143(f) requiring them to supply a written report to the Court and the opposing party not later than 15 days (the days were changed to 30 in an amendment effective July 1, 1990) before the call of the calendar. In fact, petitioner's trial memorandum listed Ms. Manley and Mr. Dittmar as fact and not as expert witnesses. The attempt to use them as experts without a proper report and without adequate notice to the opposing party would be reason enough to exclude their opinion testimony even if they had been qualified with respect to the matters for which they were offered. 3. Petitioner's Alternative Theory
Petitioner also asks us to receive Mr. Dittmar's opinion testimony under the proposed rationale that his ranching experience is analogous to those cases in which farmers familiar with a particular area have been permitted to testify as "quasi-experts" as to value. Although not analyzed within the context of either Fed. R. Evid. 701 or 702, *191 authority exists for the proposition that a witness is sufficiently qualified to give his opinion to testify as to land values where the witness is a resident, landowner, or farmer in the neighborhood. 3 J. Wigmore, Evidence, sec. 714, p. 45 (Chadbourn rev. 1970). Also see Ruud v. United States, 256 F.2d 460, 461 (9th Cir. 1958). [8]
Although Mr. Dittmar stated that he had been involved with his family's Texas ranch, there is no evidence as to the nature and extent of his experience as a rancher. Moreover, there is no evidence reflecting that he is qualified as an expert or that he has expertise or knowledge about the specific topic for which he was offered as an opinion witness. The essence of our holdings on Fed. R. Evid. 701 and 702 (that Ms. Manley and Mr. Dittmar were not sufficiently qualified to testify as owners or experts as to value) would *192 also preclude their testimony under any so-called quasi-expert approach. As in instances where a person is an owner with knowledge or an expert, it is within the trial court's discretion to permit such opinion testimony. Such testimony would not be permissible if the witness was without expertise which would assist the trier of fact, which is precisely our finding here. We think it pointless to permit opinion testimony under any theory if it will not assist the trier of fact. Accordingly, petitioner's "quasi-expert" theory does not serve to make the opinion testimony on value of the ranches by Ms. Manley or Mr. Dittmar admissible or, more importantly, probative. B. Testimony Regarding the Lack of a Recorded Easement
Respondent asserts that testimony regarding the absence of the Las Animas easement is not properly before this Court. Respondent argues that: (1) Petitioner failed to allege the lack of an easement in its petition as required by Rule 34(b)(4) and (5); (2) the lack of a recorded easement was not identified in the trial memorandum as an issue to be testified to by either petitioner's appraisal expert (Scott Binford) or Day Manley and petitioner is therefore *193 in violation of the Court's standing pretrial order; (3) the issue was not before the parties and any testimony regarding the lack of a recorded easement would constitute unfair surprise and would prejudice respondent in maintaining his position on the merits with respect to this ranch property; and (4) there is insufficient evidence to establish that the easement does not in fact exist. We note that information concerning the lack of a recorded easement was discovered about 1 week prior to trial and could not have been raised in the petition or the trial memoranda, which under our standing pre-trial order were due 15 days prior to the commencement of the trial calendar. Similarly, information about the recorded easement may not have been available to petitioner when its supplemental trial memorandum was filed (1 week prior to trial). Accordingly, we do not find that petitioner's failure to raise the easement issue in the petition or the trial memoranda is fatal to the consideration of this evidence. With respect to respondent's claim of prejudice and surprise, we note that respondent's expert, along with petitioner's expert, took it on the bank's word that an easement for Las *194 Animas existed. Although he may not be required to investigate facts, respondent had been involved in this dispute over value for some time and had every opportunity to determine the existence or lack of a deeded easement for himself. Additionally, although respondent's counsel indicated during trial that raising the easement issue constituted unfair surprise, she did not ask the Court for leave to keep the record open in order to further investigate this fact. We also note that admitting to the lack of a deeded easement is also prejudicial to the estate's and its beneficiaries' pecuniary interests. In light of these circumstances, we find that while respondent (and likely petitioner too) was surprised, he was not prejudiced by the admission of the easement testimony. Lastly, respondent asserts that petitioner has failed to prove the nonexistence of the easement or the amount of discount to which the tract is entitled. The evidence regarding the lack of a recorded easement on Las Animas consists of Ms. Manley's testimony about the bank's unsuccessful efforts to locate records of a deeded easement. Her statements were generally corroborated by Mr. Binford's testimony. Although *195 petitioner produced no other evidence to substantiate the bank's position (e.g., testimony of a public record keeper), we accept the uncontroverted testimony offered on this issue. Concerning the lack of a recorded easement, petitioner's expert stated that the value should be reduced by $ 100,000 without providing any specific rationale. Respondent's expert, through information contained in his report, provided a $ 150-per-acre adjustment for lack of a deeded easement. This information related to a comparable sale which happened to involve a lack of a deeded easement. Accordingly, we find that sufficient evidence to render a finding regarding the lack of a recorded easement is available in the record. II. The Fair Market Value of the Las Animas and the Las Vivoritas Tracts
A. Expert Witness Testimony
1. Respondent's Expert Robin Moore
The ranchland values determined in the notice of deficiency were based on an appraisal prepared for respondent in July 1985 by Robin Moore. In this appraisal, Mr. Moore valued the tracts as two separate properties. He testified that although the ranch size is generally irrelevant for valuation purposes until the acreage reaches *196 approximately 10,000 acres, special characteristics will warrant a parcel's valuation as a separate entity. He valued the McCampbell ranches separately because of the 28-mile distance between them, because of the life estate encumbering one of the ranches, and because of the stronger market for smaller ranches. The lack of a deeded easement for Las Animas, although not initially considered, also supported his separate valuations for the tracts. Mr. Moore indicated that the local economy had been in a slump due to the 1982 oil glut but had improved as of the valuation date. Land values had been appreciating at about 12 percent during the prior 4 years and during the year of the valuation. Mr. Moore used the direct sales comparison approach to valuing both tracts of ranchland. He assumed that Las Animas was owned in fee simple with no encumbrances and that access was guaranteed by a recorded easement. Mr. Moore did not independently verify that such easement existed but instead relied on the bank's assertions of this fact. Mr. Moore found that soil types in the immediate area range from fine sands to sandy loams. According to his report, soil types are classified by the U.S.D.A. *197 into eight categories: class 1 pertains to the most desirable and highly productive land, while class 8 relates to land that is the least desirable and useful. The report stated that the market recognizes a $ 50-per-acre increment between the sandy and the loamy soils. Mr. Moore's report indicated that the main topographical feature on Las Animas was its sand dunes. Dunes have a U.S.D.A. soil classification of class 8, indicating that the soil has poor productivity and is severely limited as to potential use. Mr. Moore indicated that 75 percent of the tract consisted of soil types in the class 7 and 8 ranges and that the remaining portion of the tract had sandy and loamy soil classified as class 3 soil. Mr. Moore also stated that improvements on Las Animas were minimal and included fencing, pens, a worker's house, and a hunter's house. Mr. Moore considered nine comparable sales ranging in price from $ 425 to $ 765 per acre, and determined that the tract should be valued at $ 725 an acre. The comparable relied on, however, failed to give full effect to Las Animas' poor soil classification. Mr. Moore thought the soils were similar to Las Animas' and made no adjustment. Although *198 Mr. Moore did adjust his initial price per acre by $ 25 to reflect "other comparables," a further downward adjustment of $ 25 per acre is warranted to better reflect the poor soil condition of Las Animas (75 percent class 7 or 8). Mr. Moore utilized the direct sales approach to appraise Las Vivoritas. Improvements on Las Vivoritas were minimal and consisted of perimeter fencing, a storage building, cattle pens, sheds, and two mobile home sheds at the hunter's camp. Mr. Moore considered nine comparable sales and valued this ranch at $ 750 an acre. Due to generally good soil classification (per Mr. Moore 75 percent class 3), unlimited access to the property, adequate improvements on the property, and an upward trend in prices during 1984, $ 750 per acre is a fair price for the Las Vivoritas tract before adjustments for encumbrances. Mr. Moore did not adjust for the life estate held by husband's mother, indicating that such an adjustment was not made because "the government [was] willing to allow the estate a .26955 discount for the life estate alone based on present value." During February 1989, Mr. Moore prepared a supplemental appraisal for both ranches in order to consider two *199 short-term hunting leases and a long-term grazing lease. In his opinion, the hunting lease executed by the executors in September 1984 and in effect at the time of the alternative valuation date was of short duration and did not affect the price a purchaser was willing to pay for the ranch. He also opined that the lease executed in September 1985 was not in effect at the time of the valuation date and did not effect the value of the Las Animas parcel. Based on the experience of both respondent's and petitioner's appraisers, a long-term grazing lease would warrant a 10-percent discount. It was Mr. Moore's opinion that under the terms of the lease executed by Barbara McCampbell, the discount affected all of the Las Animas ranch and the nonlife estate acreage of the Las Vivoritas tract (1,090.01 acres). Respondent conceded shortly before trial that it also applied to the 307.88 acres leased to the estate by husband's mother. However, in Mr. Moore's opinion, the discount would not apply to the portion of Las Vivoritas subject to husband's mother's life estate since that portion of the tract was not subject to the lease at the time of valuation. 2. Petitioner's Expert Scott Binford
*200 Scott Binford was instructed by the executor to value the Las Vivoritas and Las Animas tracts as one ranch. Given the use of the tracts by the McCampbells as one ranch, the need to rotate cattle over several pastures, and the grazing lease covering both tracts, he believed it would be reasonable to value both tracts as one property. However, he also acknowledged that given the homogeneity of ranchland in south Texas, it makes little difference whether the tracts are valued as one or two properties except when there are unusual characteristics such as sand dunes. Mr. Binford also acknowledged that ranchland sales could be maximized if large parcels were subdivided into smaller lots. Mr. Binford noted that ranchland prices were generally increasing in the early 1980's and did not decline until 1985. Like Mr. Moore's appraisal, Mr. Binford also utilized the comparable sales approach to valuing the ranchlands, and valued the McCampbell ranch at $ 550 an acre for a total value of $ 3,877,000. Unlike Mr. Moore, Mr. Binford also used the Cost Approach to determine a $ 7 amount per acre for the structural improvements on the subject property, although it is unclear how this adjustment *201 relates to the $ 550-per-acre price. However, where improvements are nonexistent or minimal, as in the case of the two tracts here, the cost approach duplicates the direct sales approach. Mr. Binford considered five comparable sales ranging in price from $ 425 per acre to $ 765 per acre, but none involved the sale of two noncontiguous tracts being sold as one ranch. Mr. Binford considered all five comparables to be superior because of the dunes, grazing lease, and life estate on the McCampbell ranch. However, he made no adjustment for the fact that negative characteristics, such as the dunes and life estate, affected only a portion of one parcel or the other and did not affect the entire 7,049.5 acreage. Mr. Binford acknowledged that active sand dunes consisting of the lowest possible property classification encompass only 17 percent and affect 30 percent of the Las Animas ranch. Although it is not clear from his report how Mr. Binford reached the $ 550-per-acre figure, he stated that he used "a 10 percent discount across the board for the entire property" since he believed that the entire 7,049.5-acre ranch was subject to either a long-term grazing lease and/or a life estate. *202 Mr. Binford believed that the grazing lease executed by Barbara McCampbell also covered the land subject to the life estate upon her mother-in-law's death. Mr. Binford's 10-percent discount is at odds with the Estate Tax Return wherein a 26.95-percent life estate discount permitted by the valuation tables was used. Mr. Binford also failed to consider that the condition precedent (i.e., the mother-in-law's death) had not occurred at the time of valuation. Mr. Binford stated that the lack of a deeded easement would negatively affect the value of the tract and it might require negotiations with the owner of the neighboring tract and a possible lawsuit to establish access. Mr. Binford quantified the negative impact of the lack of a recorded easement at $ 100,000. Mr. Binford also stated that "In the event a fractional or undivided interest is placed on the open market for sale, it is not unreasonable for this fractional interest to sell for less than its pro-rata share of market value." His report, however, did not include an analysis of the value of the ranches assuming a fractional interest in either the Las Vivoritas or the Las Animas tract was involved. B. Background
*203 Property includable in a decedent's gross estate is generally included at its fair market value on the date of the decedent's death. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. If the executor elects the alternative valuation date under section 2032, then fair market value is determined as of the date 6 months after the decedent's death. Sec. 2032(a)(2); sec. 20.2031-1(b), Estate Tax Regs. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551, 36 L. Ed. 2d 528, 93 S. Ct. 1713 (1973); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989); Estate of Heckscher v. Commissioner, 63 T.C. 485, 490 (1975). All relevant facts and elements of value as of the applicable valuation date shall be considered in every case. Sec. 20.2031-1(b), Estate Tax Regs. The determination of the fair market value of the McCampbell ranches involves a consideration of the following matters: (1) Whether the *204 ranches should be valued as two separate properties; (2) the nature of decedent's property interest in the 307.88 acres leased to the estate by husband's mother; (3) whether a discount should be applied for the long-term grazing lease and if applicable, the amount thereof; (4) whether a discount applies to the portion of Las Vivoritas subject to husband's mother's life estate and if so, the amount thereof; (5) the amount of discount attributable to the lack of a recorded easement on Las Animas; and (6) other miscellaneous and subarguments of petitioner. C. Separate Property Valuation
Petitioner contends that the two noncontiguous tracts were properly valued as a single ranch. Mr. Binford valued the ranches as one tract because: he had been instructed to do so by the bank; they had historically been operated as one ranch by the McCampbells; and the properties were leased for grazing as a single ranch. Although integrated use of tracts may be considered in determining what constitutes a single tract, tracts physically separated from one another frequently are not and cannot be operated as a unit; moreover, the greater the distance between them the less is the possibility *205 of unitary operation. Baetjer v. United States, 143 F.2d 391, 395 (1st Cir. 1944). The properties were separated by 28 miles. Although they were used as a single ranch by the McCampbells, given the distance between them and in light of other factors bearing on this issue, integrated use alone does not persuade us that the two tracts should have been valued as one ranch. Although the grazing lease covered both tracts, there was no reason for such use other than common ownership of both parcels. Additionally, separate hunting leases were executed for the two tracts. Petitioner's expert also recognized that there was a stronger market for smaller, subdivided parcels of land. Most importantly, both petitioner's and respondent's experts testified that while it makes little difference whether the tracts are valued separately or as one, separate valuation is appropriate where unusual characteristics affect one parcel but not the other. The life estate burdening only Las Vivoritas and the sand dunes and lack of deeded easement on only Las Animas were special features which would justify separate valuations of these tracts. Mr. Binford's failure to account for these *206 negative features on a separate tract basis led to a lower value for the ranch as a whole because his appraisal made across-the-board adjustments for these features which did not recognize that they burdened one tract but not the other. Accordingly, we find that the tracts were appropriately valued by respondent as two separate properties. D. The Nature of the 307.88 Acres Leased from Husband's Mother
Pursuant to the October 1968 Deed of Partition, husband acquired an interest in 4,363.6 acres of the Las Vivoritas tract. However, 3,273.59 acres of this parcel were subject to husband's mother's life estate, leaving a remainder interest in husband. Shortly after executing the Deed of Partition, husband's mother leased 307.88 acres to husband for the remainder of her life. Barbara McCampbell inherited these same property rights in Las Vivoritas and also received income from the hunting and grazing leases encumbering the parcel. Respondent takes the position that although the 307.88 acres would ordinarily be valued as a remainder interest, under the circumstances of this case, they have been effectively merged and converted into a fee interest. Specifically, respondent *207 asserts that the valuation tables value remainder interests on the assumption that the remaindermen receive the benefits and enjoyment of the property only at the death of the life tenant. According to respondent, because of the life-long lease from husband's mother, the decedent remainderman here received the use of the land in advance of the life tenant's death. Respondent also asserts that the income from the hunting and grazing leases and the present value thereof more than offset the rental costs paid to husband's mother allowing the remainderman to essentially enjoy all the income from the property. Respondent contends that since the decedent/remainderman derived all the income and enjoyment from the property, Barbara McCampbell essentially stepped into the shoes of the life tenant and a merger of estates occurred resulting in a fee simple interest as to the 307.88 acres. The common law doctrine of merger applies where two interests coincide and become a single interest in one person without any intermediate estate. The lesser of the two interests or estates is said to be merged into the greater. Clark v. Commissioner, 65 T.C. 126, 136 (1975). [9] At all *208 relevant times, the life estate was held by husband's mother. While decedent was in the fortuitous position of renting the property indefinitely and receiving income from the property in excess of expenses, she did not possess other ownership rights such as the right to sell or otherwise encumber the 307.88 acres. At all times these rights remained vested in husband's mother. The lease did not cause the vesting of Barbara McCampbell's remainder interest and/or a merger of her fee interest in the 1,090.01 acres with her remainder interest in the 307.88 acres. Compare Frazier v. United States, 322 F.2d 221, 222 (5th Cir. 1963), where a wife was bequeathed a life estate in certain property with the proviso that at her death it should go to her three children and on death of each child to the child's heirs. In that case, a merger of the child's secondary life estate with wife's possessory life estate occurred when a child without issue predeceased the wife. See also Estate of Reichers v. Commissioner, a Memorandum Opinion of this Court dated May 24, 1950, where decedent had a judicially determined life interest in 20 percent of trust income and an 80 percent *209 remainder interest in same, and the parties conceded that a merger of the life and remainder interests occurred upon the beneficiary's death. Accordingly, at the time of her death, Barbara McCampbell possessed only a remainder interest in the 307.88 acreage. E. The Amount and Application of the Discount for the Long-Term Grazing Lease
In his supplemental report, respondent's expert considered the impact on value of a long-term grazing lease as to 1,397.89 acres (1,090.01 and 307.88) of the Las Vivoritas tract and all 2,685.9 acres of the Las Animas tract. Mr. Moore opined that a 10-percent discount should be employed. Petitioner's expert witness concurred with the 10-percent discount. However, petitioner argues that the grazing lease would also apply to all life estate acreage in the event of husband's mother's death and so the 10-percent *210 discount should apply to the entire 4,363.3 acres. At the time of Barbara McCampbell's death, husband's mother was alive and operating a cattle ranch on her life estate tract. Because the condition precedent (i.e., husband's mother's death) had not occurred at the alternative valuation date, the 10-percent discount will not be applied to the entire life estate portion of Las Vivoritas. Accordingly, the discount is to be applied to the Las Animas tract as a whole and to the 1,397.89 Las Vivoritas acres leased to or held in fee by Barbara McCampbell. F. The Amount and Application of the Discount Attributable to the Life Estate Encumbering Las Vivoritas
Petitioner asserts that a 10-percent discount applies to the total acreage of both ranches together, based on the grazing lease and the life estate encumbering the properties. We find that the proper discount is the 26.955 percent taken from the I.R.S. valuation tables. The estate tax return as filed in December 1984 employed the 26.955-percent discount in valuing the life estate, as did respondent in his notice of deficiency. This discount is applicable to all of the 3,273.59 acres subject to Mae McCampbell's life estate, *211 including the 307.88 acres leased to the Estate. G. The Amount of Discount Attributable to the Lack of Recorded Easement on Las Animas
Although the absence of a deeded easement was not established until 1989, a "willing buyer" with knowledge of the relevant facts would have discovered the lack of easement as of the alternative valuation date. The absence of deeded access to the property would have a negative effect on value. Petitioner's expert proposed a negative adjustment of $ 100,000 ($ 37.23 per acre) but provided no indication as to how he arrived at that amount. Respondent's expert's report contained a comparable sale without a deeded easement, and a negative adjustment of $ 150 was made to the per-acre price of that comparable to reflect the lack of easement. We are not certain that this comparable was in all respects similar to Las Animas. Therefore, we find that the amount of the discount is properly determined by averaging petitioner's and respondent's figures. Accordingly, the value of the Las Animas tract will be adjusted by $ 94 an acre to reflect the lack of a deeded access. H. Miscellaneous Arguments Raised by Petitioner
Petitioner takes issue *212 with several aspects of Mr. Moore's report. First, we are asked to consider Mr. Moore's lack of experience in appraising ranch property and the lack of technical precision in preparing the report. Relative to Mr. Binford, Mr. Moore was not highly experienced in valuing south Texas ranches; however, his report did not lack technical precision and was in fact more persuasive than Mr. Binford's report. Mr. Moore's time adjustments were calculated on the basis of appreciation rates generated from the sale and resale of certain comparables. Petitioner asserts that the adjustments were inconsistent. Mr. Moore's testimony regarding these adjustments was inconsistent with respect to only one of four comparables discussed. Petitioner asserts that Mr. Moore failed to make any adjustments for the size of the ranch. Mr. Moore indicated that size adjustments would not normally be made until the acreage reached 10,000 acres. Because Mr. Moore was valuing two separate properties each less than 10,000 acres, a size adjustment was unnecessary. Finally, petitioner argues that Mr. Moore failed to make an $ 80 adjustment to comparable 4 as he had done for this same property in an unrelated ranch *213 appraisal to reflect an overpriced property exchange. We did not rely on this comparable in making our fair market value determination and this error is of no significance. Similarly, Mr. Moore's failure to recite the Treasury regulation definition of "market value" does not change the fair market value of the properties under consideration. III. Conclusion
In light of the foregoing, we find that the value of the Las Vivoritas and the Las Animas tracts as of the September 1984 valuation date was $ 2,512,408 and $ 1,464,889, respectively. Therefore, the McCampbell ranches are properly valued at $ 3,977,297, before adjustment for fractional interests. [10]
*214 IV. The Interest Passing to Barbara McCampbell Under Dick Jones McCampbell's Will
The estate tax return for decedent included 100 percent of both ranches in her gross estate. However, in administering husband's estate, petitioner subsequently interpreted Mr. McCampbell's will to require that 86 percent of the ranches fund Mrs. McCampbell's marital bequest and the remaining 14 percent fund the residuary trust. [11] Petitioner seeks a determination, on the basis of our interpretation of husband's will, of the correctness of its funding decision. Petitioner argues that conflicting intentions in husband's will should be interpreted so that only a fractional portion of the ranches is necessary to fund the marital bequest. Respondent simply argues that if petitioner was correct in its argument and interpretation, decedent's estate and the estate tax return would have included only a percentage of the ranches, rather than the entire amount. *215 Section 2056(a) (as in effect at the time Mr. McCampbell executed his testamentary documents and at the date of his death) allowed estates an unlimited marital deduction for the value of any interest in property passing from a decedent to a surviving spouse, if the interest in property passed was not terminable as defined by section 2056(b). Paragraph A-1 of husband's will sought to utilize this deduction by providing an outright bequest of property equal in value to the maximum marital deduction allowable to his estate. Paragraph A-1 stated that this bequest was pecuniary and could be satisfied in cash or in kind. Additionally, the executor was specifically empowered to sell the property to satisfy the bequest. However, paragraph A-1 also made clear that husband did not intend to gift to his spouse his entire estate, but only so much of his gross estate as would produce no estate tax after allowing for the unified and State death tax credits available to it. On the date of Mr. McCampbell's death, the unified credit was $ 79,300 or an exemption equivalent to $ 275,000. According to Schedule M, his estate also factored in the $ 44,901 in administrative expenses in calculating *216 the amount of the marital deduction. The $ 44,901 amount is not, of course, a part of the marital deduction. Therefore, under the language of paragraph A-1, Mr. McCampbell gave his wife an amount of property equal to $ 1,831,667. [12] However, no specific directions were given in the will as to which assets were to fund the amount of this marital bequest. Any assets or properties remaining after fulfilling the marital bequest were to be disposed of as part of the residuary estate, pursuant to paragraph B of the will. The residuary estate consisted of a trust for the benefit of Mr. McCampbell's wife and children. Upon the death of Mrs. McCampbell, one-half of the income and principal from the residuary trust was to remain in trust for Mr. McCampbell's daughter and her children. The other one-half was to remain in trust for his son and his son's children. Again, the will did not specify which assets *217 would fund the residuary trust, but generally it was the assets remaining after the marital bequest. However, paragraph B-5 states that Mr. McCampbell "desire[d] to designate the use of the ranchland portions of [his] estate all of which shall pass in trust as above specified." It is likely from a reading of the will that Mr. McCampbell was referring to the paragraph B-2 residuary trust and that he intended that the ranches pass intact first to his wife (who was not a blood relative) and second and most importantly to his bodily heirs (i.e., children and grandchildren) pursuant to the paragraph B-2 residuary trust. Moreover, his concern for assuring that his properties pass to his children and blood-related heirs also appears in the language of paragraph B-2, and is reflected by the will's provision for a right of first refusal, and by Mr. McCampbell's independent actions in executing the codicil regarding the ranch assets. Nonetheless, the marital bequest and the residuary estate clauses of Mr. McCampbell's will would be in conflict unless the realty were fractionalized and the returned values were correct. [13] In order to carry out the marital bequest mandate that no tax be due *218 on Mr. McCampbell's estate, Mrs. McCampbell had to receive assets valued at $ 1,831,667 ($ 2,151,568 (gross estate), less $ 275,000 credit equivalency amount, less $ 44,901 administrative expenses). According to Mr. McCampbell's return, the ranchlands were valued at $ 1,680,087. One way to fund the marital bequest would be to give Mrs. McCampbell the ranchland assets outright. That approach would ignore the expressed intent that the ranchlands pass in trust for use by Mrs. McCampbell and, more particularly, the two children. Yet, if all the ranchlands passed intact to the residuary trust, as provided in paragraph B-5, Barbara McCampbell would have received property in value of only $ 471,481 ($ 2,151,568 - $ 1,680,087). The marital deduction would have therefore been reduced from $ 1,831,667 to $ 471,481 resulting in substantial tax owed by the estate. This outcome defeats what appears to be Mr. McCampbell's main desire to pass as many assets as possible tax free at his death. *219 In construing this will we must ascertain the testator's intentions. To this end, the will should be construed in its entirety and all of its provisions should be harmonized and given effect, if possible, so that none are without meaning. Atwell v. United States, 339 F. Supp. 425, 431 (S.D. Tex. 1972); Krausse v. Barton, 430 S.W.2d 44, 49 (Tex. Civ. App. 1968); St. Marks Episcopal Church v. Lowry, 271 S.W.2d 681 (Tex. Civ. App. 1954). Courts should endeavor to reconcile two apparently inconsistent provisions of a will rather than to absolutely ignore either or to give effect to one over the other. 4 W. Bowe and D. Parker, Page on Wills, sec. 30.20, p. 128 (1961). Where clauses are irreconcilable, then the provision which seems most nearly to comport with the intention of the testator, as gathered from the entire instrument, should be given effect. Burney v. Burney, 145 Tex. 311, 197 S.W.2d 334, 336 (1946); Wallace v. First Nat. Bank of Paris, 120 Tex. 92, 35 S.W.2d 1036, 1038 (1931); Norton v. Smith, 227 S.W. 542, 547 (Tex. Civ. App. 1920). *220 An express bequest cannot be diminished by a subsequent clause of ambiguous meaning, unless the language therein is as clear, plain and unequivocal as that in the first grant. Bullington v. Estate of Belcher, 665 S.W.2d 517, 518 (Tex. App. 1983); Roberts v. Drake, 380 S.W.2d 657, 661 (Tex. Civ. App. 1964); 4 Bowe and Parker, supra. Additionally, after an absolute bequest or devise has been made, no precatory words of the testator to his legatee or devisee should defeat the estate previously granted. Ricketts v. Alliance Life Ins. Co., 135 S.W.2d 725, 731 (Tex. Civ. App. 1939). The expression "It is my desire," is ordinarily precatory in its nature and is not mandatory. The phrase cannot be construed as mandatory, unless from a reading of the entire will and the circumstances and situation of the testator and beneficiaries, it is clear that the intention of the testator was to create a mandatory bequest. Jones v. Ives, 462 S.W.2d 610, 613 (Tex. Civ. App. 1971); Hunt v. Hunt, 329 S.W.2d 488, 489 (Tex. Civ. App. 1959). Mr. McCampbell had two purposes uppermost in his mind when *221 he executed the will: (1) That no estate tax would be due at his death; and (2) that the ranchlands should be preserved and pass for the benefit of his bodily heirs, should they survive him. Respondent argues that the first purpose predominates, while petitioner advocates the prevalence of the second. After considering the entire record and the surrounding circumstances, we find that neither of these intentions need be exclusively preferred. Although tax savings were clearly important, the testator was also concerned that the ranchlands remain in the immediate family and that they pass to his bodily heirs. Both concerns can be fully effectuated if the will is construed to use the ranchlands to fund both the marital bequest and the residuary trust. The executor has sought to divide the tracts into fractional interests. We agree with this conclusion but find that the residuary trust should receive an amount equal to 16 percent [14] of the value of the ranchlands with the remaining 84 percent being used to fund the marital bequest. Under that approach, both wishes are satisfied. Paragraph A-1 would permit the full funding of the pecuniary marital bequest albeit with fractional *222 interests in estate property. Also, the codicil's allocation of the ranches between Mr. McCampbell's children and the provision granting for a right of first refusal in case of a sale of the ranches indicate that Mr. McCampbell understood that the ranches would not always remain "intact." Based on a reading of the entire will and upon a consideration of all surrounding circumstances, we hold that the ranches may be fractionalized to satisfy the bequests of the testator. Respondent advances several arguments against funding the provisions with a fractional interest in the ranchlands. First, he asks us to construe the paragraph B-5 reference to "above specified trust" as a reference to the disclaimer trust in paragraph B-3 of the will. While this provision was meant to meet the contingency situation where one beneficiary decided to forego his or her interest under the will, *223 it was not intended to affect the general manner in which the property passed. Respondent also asserts that under general will construction principles, the express grant to Mrs. McCampbell in paragraph A-1 should not be diminished by the ambiguous language of B-5. Our interpretation of the will as a whole reveals that the reference in paragraph B-5 to "above specified trust" was intended to be a reference to the paragraph B-2 trust and therefore no ambiguity would exist in interpreting paragraph B-5. While paragraph A-1 contains the intent that some portion of the estate pass to Mrs. McCampbell in fee, the specific property is not defined. We decline to apply the rule of construction espoused by respondent. Respondent also seeks to establish that the passing of the ranches tax free under the marital bequest was the dominant, and therefore, controlling, intent of the will. We disagree. While it is clear that Mr. McCampbell wished to take advantage of the unlimited marital deduction, it is also clear that he was concerned with making sure that the ranchlands remained in the immediate family. This intent was expressed in paragraph B-5 and by the special effort he took to execute *224 the codicil regarding use of the ranchlands by his children. The marital bequest does not require that the executor use the ranch properties for funding. Lastly, respondent argues that the initial return prepared by petitioner included the full acreage of both ranches and did not seek to include only a fractional interest. Alternatively, he asserts, that the fractional interest position is a new issue and that petitioner has failed to establish the value for and the fact that liquid assets from Mr. McCampbell's estate were in existence at Mrs. McCampbell's death and passed to her estate. Although the return did include the full acreage of the ranches, the fractional interest issue was raised by petitioner in the original petition and was pursued at trial. It is not a new issue. A review of both estate tax returns reveals that many of the liquid assets listed in Mr. McCampbell's return were also listed in Mrs. McCampbell's return. Concessions by the parties also support this conclusion (e.g., regarding the inclusion of the Consolidated Edison stock). Accordingly, we find respondent's position to be without merit and hold that Mr. McCampbell's will may be interpreted to allow *225 a funding of the marital and residuary bequests with 84 percent and 16 percent, respectively, of the ranchland values. V. Application of a Valuation Discount to Undivided Fractional Interest in Real Property
Petitioner asserts that a 16-percent discount is applicable to the 84-percent fractional interest held by decedent due to the limited marketability of such interests. Respondent and petitioner agree that where they apply, discounts for fractional interests are based on minority ownership and the lack of control over the property occasioned thereby. Regardless of whether or not such a discount could apply in this case, there is no admissible evidence supporting petitioner's entitlement to a minority interest discount. Mr. Binford never addressed this issue in his expert report and the Court under Rule 143(f) refused to allow him to testify as to this issue at trial. Although Mr. Dittmar testified regarding his opinion as to what he thought this discount should be, as discussed supra, his testimony was not admissible as either lay or expert witness opinion testimony. No other evidence establishing that the fractional interest was less than a pro rata share of the *226 property was presented. Similarly, no evidence was presented to show the negative impact arising from co-ownership of the property by a trust, from the right of first refusal held by the beneficiaries or from their hostility (if any) to nonfamily ownership of the property. Petitioner has failed to carry its burden of proof on this issue and we therefore find that petitioner has not shown that a minority interest discount is applicable. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. In accordance with the stipulation of facts, the parties have eliminated certain issues by agreeing that: (1) This Court has no jurisdiction to review respondent's determination that the estate is not entitled to use the election to pay the estate tax due in installments pursuant to sec. 6166, I.R.C.; (2) petitioner is allowed to elect to postpone the part of the estate tax attributable to the remainder interest pursuant to sec. 6163, I.R.C.; (3) Consolidated Edison stock is includable in the estate in the amount of $ 9,500; and (4) the estate is allowed a Federal income tax expense deduction in the amount of $ 5,683 pursuant to sec. 2053, I.R.C.↩
2. Conveyance documents and tax returns refer to acreage in the amount of 2,688.5; however, the parties stipulated to the 2,685.9 acreage.↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect at the date of decedent's death, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Rule 701. Opinion Testimony by Lay Witnesses If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions and inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.↩
5. See also Annotation, Admissibility of Opinion of Nonexpert Owner as to Value of Chattel, 37 A.L.R.2d 967 (1954); Annotation, Public or Corporate Officer as Within Rule That Owner of Property May Testify to Value Thereof, 45 A.L.R. 1494↩ (1926).
6. Rule 702. Testimony by Experts If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.↩
7. This case would be appealable to the Court of Appeals for the Fifth Circuit.↩
8. See also Annotation, Competency of Witness to Give Expert or Opinion Testimony as to Value of Real Property, 159 A.L.R. 7↩ (1945).
9. See also Kloppenberg and Company v. Commissioner, T.C. Memo 1986-325; Estate of Hankins v. Commissioner, T.C. Memo 1981-326↩.
10. These amounts were derived as follows: ↩
LAS VIVORITAS
A. Fee Interest (1,090.01 acres)
Initial value per acre
$ 750.00 Value before discount
817,508.00 Less: 10% discount for grazing lease
(81,751.00)
Total value of fee interest
$ 735,757
B. Remainder Interest (2,965.71 acres)
Initial value per acre
$ 750.00 Value before discount
2,224,283.00 Less: 26.95% discount
(599,444.00)
Total value of remainder interest
$ 1,624,839
C. Remainder Interest/Leased Property
(307.88 acres)
Initial value per acre
$ 750.00 Value before discount
230,910.00 Less: 10% discount for grazing lease
(23,091.00)
Adjusted value before discount
207,819.00 Less: 26.95% discount
(56,007.00)
Total value of interest
$ 151,812
Total value of Las Vivoritas
$ 2,512,408
LAS ANIMAS (2,685.9 acres)
Initial value per acre
$ 725.00 Less: further adjustment for soil
(25.00)
Less: adjustment for easement
(94.00)
Per acre value before discount
$ 606.00 Value before discount
$ 1,627,655.00 Less: 10% discount (grazing lease)
(162,766.00)
Total value of Las Animas
$ 1,464,889
Total value of the McCampbell ranches
$ 3,977,297
11. As discussed infra, we have determined that the proper percentages are 84 and 16 percent, respectively.↩
12. The parties used a marital deduction amount of $ 1,876,568 which included $ 44,901 in administrative expenses.↩
13. We note that Mr. McCampbell died about 1 year prior to Mrs. McCampbell's death, and it is unlikely that the values increased as substantially as is reflected by the difference between the returned values and the values we have found. Nonetheless, we interpret Mr. McCampbell's will as we find it.↩
14. This percentage is derived as follows: residuary estate
$ 275,000
=
16 percent
parcels' value on
$ 1,680,000
husband's return↩